UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| DAVID ALAN HOWARD, | CASE NO. 3:21-CV-01762-JJH |
| Plaintiff, | JUDGE JEFFREY J. HELMICK |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | REPORT AND RECOMMENDATION |
| Defendant. | |

INTRODUCTION

Plaintiff David Howard filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On September 13, 2021, pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry of Sept. 13, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Mr. Howard filed for DIB on September 9, 2019, alleging a disability onset date of January 18, 2016. (Tr. 98, 190). He later amended his alleged onset date to September 28, 2018, and then at his hearing motioned to change his onset date to April 8, 2019. (Tr. 68, 99). His claims were

denied initially and on reconsideration. (Tr. 98-116, 119-28). He then requested a hearing before

an Administrative Law Judge. (Tr. 141-42). Mr. Howard (represented by a non-attorney

representative), and a vocational expert (VE) testified at a hearing before the ALJ on August 18,

2020. (Tr. 63-97). On September 2, 2020, the ALJ issued a written decision finding Mr. Howard

not disabled. (Tr. 39-57). The Appeals Council denied Mr. Howard's request for review, making

the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955,

404.981). Mr. Howard timely filed this action on September 13, 2021. (ECF #1).

FACTUAL BACKGROUND

I.    ADMINISTRATIVE HEARING

The following summarizes the testimony of Mr. Howard and VE John Finch, presented

during the hearing before the ALJ on August 18, 2020.

During her opening, Mr. Howard's representative noted a prior request to change his

alleged onset date to April 8, 2019, as Mr. Howard had been working at substantial gainful activity

levels from January through September 2019. (Tr. 68). The representative also informed the ALJ

that Mr. Howard had just begun a new job on July 27, 2020; she indicated the ALJ may need to

consider a closed period for benefits. (*Id.*). Mr. Howard was attending the telephonic hearing while

in his car during his lunch break at work. (Tr. 71).

Mr. Howard then testified. He stated he lived in a two-story home with his wife and

teenage granddaughter, where the laundry and bathroom were on the first floor, and he slept on

the second floor. (Tr. 70, 72). He stated that he has "taken quite a few falls" because of his

arthritis, pain, and dizziness and blurred vision from his migraines. (Tr. 70). Mr. Howard has his

driver's license; he was permitted to drive because he had been more than six months seizure-free.

2

(Tr. 73). He does not have a handicapped placard for his vehicle. (Tr. 74). Mr. Howard drives 55 miles each way for work. (Tr. 75).

Mr. Howard was working full-time as a die technician at the time of the hearing. (Tr. 75). His previous job was as a customer service technician repairing, installing, modifying, and upgrading a hot runner system for injection molds. (Tr. 75-76). In that position, Mr. Howard was required to lift 50 to 75 pounds; the required lifting in that job led to Mr. Howard needing a triple hernia surgery. (Tr. 76). Mr. Howard also had past work as a tool room supervisor; he kept track of on-time repairs and maintenance and directing employees. (*Id.*). He was not required to lift much in this job but was often on his feet. (*Id.*). Mr. Howard also had past work in engineering and worked as a mold repair technician in multiple companies. (Tr. 77-78). He worked part-time at Lowe's but was unable to keep the position due to pain, stress, and anxiety. (Tr. 80).

Mr. Howard described his alleged disabling impairments as severe migraines ("I'd feel almost paralyzed like I couldn't move") and "out of control" blood pressure. (Tr. 82). Mr. Howard also described being slower at physical work than he used to be, having temporary short-term memory issues, and anxiety. (Tr. 91). Mr. Howard has also had a stroke (Tr. 84) and a stress-related heart attack. (Tr. 91). His blood pressure has since come under control. (Tr. 82). Mr. Howard still experiences migraines and takes sumatriptan. (*Id.*). However, this medication is not a preventative treatment and is only taken when he has migraine symptoms; it helps improve the length and intensity of the migraine but not their frequency. (*Id.*). He estimated that he still experiences migraines five out of every seven days. (Tr. 84). He had not missed any days of work due to migraines, although he was sent home with possible COVID-19 symptoms on a day that he had migraine symptoms and took sumatriptan. (Tr. 84-85).

Mr. Howard denied having an alcohol problem. (Tr. 85-86). He explained there was reference to an alcohol problem in his medical record after he had responded that he drank occasionally during an emergency room visit; it was later addressed in follow up and with his neurologist. (*Id.*). Mr. Howard takes a low dose of Xanax for his anxiety and depression. (Tr. 86-87).

VE Finch then testified. He identified Mr. Howard's past work as injection mold repairer, DOT 601.280-030, heavy exertional level, SVP 7, skilled, performed at medium and heavy; tool room supervisor, DOT 601.130-010, light exertional level, SVP 8, skilled, performed at sedentary; and tool engineer, DOT 169.167-054, light exertional level, SVP 7, skilled, performed at light. (Tr. 93-94).

The ALJ then asked the VE to consider a hypothetical individual of Mr. Howard's age, education, and experience, with the residual functional capacity (RFC) for medium work; can never climb ladders, ropes, or scaffolds; can frequently balance, stoop, kneel, crouch, and crawl; must avoid all exposure to hazards such as unprotected heights, dangerous machinery, and commercial driving; can understand, remember, and carry out simple instructions, perform simple routine and repetitive tasks but not at a production-rate pace such as assembly line work; can adapt to routine changes in the workplace that are infrequent and easily explained; can interact frequently with supervisors, coworkers, and the general public. (Tr. 94-95). VE Finch testified such an individual would not be able to perform Mr. Howard's past work. (Tr. 95). However, the VE identified other occupations the hypothetical individual could perform, all medium strength and unskilled SVP 2 positions. (*Id.*). These jobs included order picker, DOT 922.687-058, 120,000 jobs nationally; hand packager, DOT 920.587-018, 60,000 jobs nationally; and laundry worker, DOT

4

361.684-014, 200,000 jobs nationally. (*Id.*). If the individual were limited to light work, past work would still be eliminated. (*Id.*).

VE Finch testified that ordinary breaks include a fifteen-minute break in the morning and afternoon, and a thirty-minute lunch. (*Id.*). Employers tolerate no more than one absent incident per month, including coming in late or leaving early. (*Id.*). On-task behavior is expected at 92 percent, with only eight percent of the day off-task. (*Id.*).

In response to a question from Mr. Howard's representative, VE Finch testified a hypothetical individual limited to occasional handling and fingering could not perform the jobs he previously identified. (Tr. 96).

## II. PERSONAL AND VOCATIONAL EVIDENCE

Mr. Howard was 57 years old at the time of his alleged onset date, and 59 years old at the time of the administrative hearing. (Tr. 56, 70-71). Mr. Howard completed high school. (Tr. 56, 74). In the past, he has been employed as an injection mold repairer, tool room supervisor, and tool engineer. (Tr. 55).

## III. RELEVANT MEDICAL EVIDENCE[1]

On April 12, 2016, Mr. Howard underwent a neuropsychological evaluation, performed by Nicholas Denbesten, Ph.D. (Tr. 324-27). Dr. Denbesten noted Mr. Howard had suffered loss of consciousness during a severe motor vehicle accident in 1983, and experienced "patchy memory" for five to seven years thereafter. (Tr. 324). However, Mr. Howard "reported feeling complete

---

[1] Because Mr. Howard did not submit a Supplement with his Brief on the Merits (as required by the Initial Order, *see* ECF #4), I have summarized here the pertinent evidence in the medical record as presented in his Statement of the Facts. (Pl.'s Br., ECF #8, PageID 687-89). But because Mr. Howard does not argue for Sentence Six remand, I do not summarize the evidence dated after the ALJ's September 2, 2020 decision. (*See id.* at 689-90).

recovery and was capable of obtaining very competitive employment." (*Id.*). Based on the results of testing, Dr. Denbesten concluded Mr. Howard had average intellectual functioning and no compelling signs of cognitive impairment. (Tr. 326). Mr. Howard displayed borderline to mild slowed processing speed during evaluation, but Dr. Denbesten concluded this was likely due to distraction, as it did not appear to functionally translate in Mr. Howard's daily functioning. (*Id.*). Dr. Denbesten noted Mr. Howard had severe anxiety with minimal depression. (*Id.*).

Dr. Denbesten opined Mr. Howard demonstrated "near to complete cognitive recovery" after the accident. (*Id.*). In Dr. Denbesten's opinion, Mr. Howard's subjective fears of cognitive decline resulted from anxiety and stress, compounded by lack of structure on his days off from work, and alcohol consumption. (Tr. 326-27). Dr. Denbesten opined that, from a cognitive standpoint, no activity restrictions were necessary. (Tr. 327). Dr. Denbesten recommended reducing alcohol consumption, creating structure on his days off, more aggressive treatment of his severe anxiety and mild depression, and trialing Xanax as a maintenance medication rather than as needed. (*Id.*).

Mr. Howard was admitted to the emergency department on September 19, 2016, for chest pain (likely noncardiac), hypertension, anxiety, panic attack, obstructive sleep apnea, insomnia, tobacco and alcohol use, hyponatremia (likely due to beer and water overuse)[2], and significant psychosocial stressors at home. (Tr. 454). Mr. Howard was discharged on September 20, 2016, with a recommendation to follow up with his primary care physician, Brett Kuns, D.O., and to

---

[2]       Hyponatremia is low blood sodium. *Low blood sodium, MedlinePlus*, http://medlineplus.gov/ency/article/000394.htm (last visited August 19, 2022).

establish with a psychiatrist if he wished to continue using Xanax at nighttime for sleep. (Tr. 454-55).

Christopher Hassett, D.O., met with Mr. Howard on July 31, 2018, regarding an episode on July 25 of entire body shaking that lasted less than two minutes. (Tr. 329). Dr. Hassett indicated a generalized tonic-clonic seizure; Mr. Howard reported confusion lasting the rest of the day. (Tr. 329, 330). Dr. Hassett opined Mr. Howard should be on treatment and prescribed Keppra 500 mg twice daily. (Tr. 331).

An August 9, 2018 MRI of Mr. Howard's head revealed parenchymal volume loss and chronic microvascular ischemic changes with probable small subacute lacunar infarct in the right thalamus. (Tr. 332). A routine EEG on August 29, 2018 was normal. (Tr. 333-34).

On September 10, 2018, Mr. Howard presented to Dr. Hassett for follow-up after the seizure episode. (Tr. 335). Mr. Howard reported his headaches had improved after he returned to work; they were not as frequent nor as strong as they had been. (*Id.*). Dr. Hassett encouraged medication compliance after Mr. Howard indicated he had not been taking his medication as prescribed. (*Id.*).

On November 24, 2018, Mr. Howard presented to the emergency department complaining of generalized illness and noting he had been experiencing flulike symptoms for the last one to two weeks, including nausea, vomiting, diarrhea, and body aches. (Tr. 395). That morning, he had awoken and had bitten his tongue, although no one had witnessed him having a seizure. (*Id.*). Catherine Taylor, M.D., witnessed Mr. Howard have a generalized tonic-clonic seizure lasting about two minutes. (Tr. 398-99). Mr. Howard was given Ativan and Keppra. (Tr. 400). Mr. Howard reported he had been taking his seizure medication, but he was not sure if it was staying

down due to his vomiting. (*Id.*). Mr. Howard recounted that he had experienced four seizure episodes since his first hospitalization in July 2018. (*Id.*).

The attending physician, Safwan Khader, M.D., noted that Mr. Howard was presenting with recurrent seizures that appeared to be due to multiple factors including electrolyte imbalance, alcohol abuse, hyponatremia, and depression. (Tr. 406). Mr. Howard's plan included seizure and CIWA[3] protocols. (*Id.*). Nicole Danner, D.O., noted Mr. Howard's home medications included a prescription for Ultram for pain. (Tr. 408). However, Ultram is seizure-genic and should not be prescribed to seizure patients; this may have contributed to lowering Mr. Howard's threshold for seizures, causing the breakthrough seizure. (*Id.*). Dr. Danner noted that Mr. Howard had been doing well on his home-based Keppra prior to contracting a viral illness and vomiting; he had not had seizures since receiving IV Keppra in the emergency department. (*Id.*).

On July 29, 2019, Mr. Howard presented to the emergency department complaining of nausea, vomiting, diarrhea, and typical migraine symptoms. (Tr. 385, 387). Emergency department notes indicate dehydration, GI illness, renal failure and anemia, as well as chronically low sodium due to alcohol use (Mr. Howard indicated he drank "beer on weekends"). (*Id.*). Mr. Howard was given fluids and Reglan and discharged in stable condition. (Tr. 387).

Mr. Howard was hospitalized from August 1 to 3, 2019 after a seizure at home. (Tr. 339-43). Notes indicate that Mr. Howard was previously taking Keppra, but had not used for some

---

[3]     CIWA-AR stands for Clinical Institute Withdrawal Assessment Alcohol Scale Revised and is used by medical professionals to assess and diagnose the severity of alcohol withdrawal. Amelia Sharp, *CIWA-AR Assessment for Alcohol Withdrawal*, http://americanaddictioncenters.org/alcoholism-treatment/ciwa-ar-alcohol-assessment (Mar. 10, 2022).

time[4] due to financial issues. (Tr. 339, 343). He was started on IV Keppra and admitted for further evaluation. (Tr. 340). EEG results showed findings with frequent discharges with high propensity for seizures in the left frontal lobe. (*Id.*). Mr. Howard was advised to continue lifelong antiepileptic medication and to avoid driving until six months seizure-free. (*Id.*). His discharge diagnosis indicated a history of alcohol abuse, hyponatremia, hypokalemia, seizure, nausea, vomiting, diarrhea, odynophagia,[5] esophagitis, and duodenal ulcer. (Tr. 339).

On September 5, 2019, Mr. Howard followed up with Dr. Kuns after his hospital stay. (Tr. 464). Dr. Kuns noted that Mr. Howard was positive for fatigue, seizure disorder, difficulty sleeping, and migraines. (*Id.*). Mr. Howard also reported having dysphagia and vomiting. (*Id.*). Dr. Kuns recorded that Mr. Howard had chronic hyponatremia, which is worsened with fluid depletion (*i.e.*, vomiting and diarrhea). (Tr. 466). Dr. Kuns indicated the combination of Mr. Howard's GI symptoms, gastroenteritis, and chronic alcohol use chronically lowers his sodium, which contributes to breakthrough seizures. (*Id.*). Mr. Howard admitted he was not always compliant with medication. (*Id.*). Mr. Howard's wife stated that Mr. Howard had been declining mentally, including having difficulty remembering, difficulty with comprehension, increased depression, and OCD tendencies. (Tr. 466). Dr. Kuns stated in his notes "[i]n my medical opinion this patient is not able to work." (*Id.*). Dr. Kuns based this opinion on chronic pain, seizure disorder, difficulty with eating, and underlying anxiety disorder. (Tr. 467). Mr. Howard had applied for social security disability. (Tr. 466).

---

[4]    As to the precise length of time Mr. Howard had not been taking Keppra, hospital notes ranged from "for some time" (Tr. 339), "the last 3 days" (Tr. 343), and "6 months" (Tr. 344).
[5]    Odynophagia is painful swallowing, while dysphagia is difficulty swallowing. Kristeen Cherney, Sara Minnis, M.S., CCC-SLP, *Odynophagia*, http://www.healthline.com/health/odynophagia (Sept. 2, 2018).

9

On September 5, 2019, Mr. Howard presented to Lawrence McCormack, M.D., for his dysphagia, after referral from Dr. Kuns and an EGD on August 2, 2019. (Tr. 462). Mr. Howard reported dysphagia with solids, as well as complaints of diarrhea. (*Id.*). Dr. McCormack added Gaviscon after meals and planned a repeat EGD in early October. (Tr. 463). At follow-up on October 4, 2019, EGD results showed severe ulcerative esophagitis. (Tr. 484). His GERD symptoms had cleared but Mr. Howard still experienced some dysphagia. (*Id.*).

On November 5, 2019, Mr. Howard followed up with Dr. Kuns. (Tr. 540). Mr. Howard reported having undergone a procedure for a "collapsed" larynx; he acknowledged improvement in breathing and swallowing post-procedure. (*Id.*). Mr. Howard also reported multiple falls, blurry vision, headaches, and occasional chest tightness. (*Id.*). Mr. Howard's migraines had increased since starting a part-time job at Lowe's. (Tr. 542). Mr. Howard noted that his falls were always to the left; Dr. Kuns recommended follow up with his neurologist. (*Id.*).

On December 5, 2019, Mr. Howard was examined by cardiology at North Ohio Heart, on referral from Dr. Kuns after some atypical chest pains. (Tr. 509). A heart catheterization from 2009 had no findings of any significant coronary disease. (*Id.*). A recent stress test was unremarkable. (Tr. 509, 514-16). The cardiologist noted that the chest pains appeared to be a stress response, as there was no evidence for ischemia. (Tr. 509). Follow up was recommended only on an as-needed basis. (Tr. 511).

On March 10, 2020, Mr. Howard followed up with Dr. Kuns, who noted that Mr. Howard continued to follow with his neurologist, Dr. Hassett. (Tr. 563). Mr. Howard was positive for fatigue, arthralgias, cervical spine pain, lumbosacral spine pain, hypertension, seizure disorder, difficulty sleeping, headaches/migraines, history of lacunar infarct, and memory loss. (*Id.*). Mr.

10

Howard reported increased generalized arthritis pain and difficulty rising from a squatting position. (*Id.*). He complained of weakness and inability to carry items up or down stairs; he continued to have frequent falls and memory loss. (*Id.*). He would sometimes get lost if driving over ten or fifteen miles. (*Id.*). Mr. Howard reported his migraines were worsening in the left temporal lobe; some days he was unable to get out of bed. (*Id.*). He had been seizure-free for six months. (Tr. 565). Dr. Kuns indicated Mr. Howard had been prescribed Xanax after a neuropsychological evaluation some years prior; Mr. Howard stated it had been losing its efficacy, but Dr. Kuns did not change the prescription and continued to monitor. (*Id.*).

On April 28, 2020, Mr. Howard presented to Dr. Hassett for follow up on his seizures. (Tr. 581). Dr. Hassett noted that Mr. Howard had been seizure-free for seven months, and that he was taking and tolerating his medication well without side effects. (Tr. 581). However, Mr. Howard was still experiencing migraines and gait instability. (*Id.*). Dr. Hassett assessed Mr. Howard with partial symptomatic epilepsy with simple partial seizures, not intractable, and stable on medication. (Tr. 582). The previous MRI was unremarkable, and his most recent EEG was normal. (*Id.*). Dr. Hassett also assessed Mr. Howard with chronic migraines, helped with triptan; Dr. Hassett continued Mr. Howard on triptan and recommended considering prevention with Calcitonin Gene Related Peptide (CGRP) in the future due to multiple comorbid conditions. (*Id.*).

On April 30, 2020, Mr. Howard had an EMG of his bilateral upper extremities due to complaints of pain radiating down into his left arm with numbness, tingling, and burning. (Tr. 578). Dr. Hassett assessed Mr. Howard with cervical radiculopathy and paresthesia. (*Id.*). An April 17, 2020 EMG of the lower extremities revealed essentially normal findings of the lower extremities, with a suggestion of an L5 radiculopathy on the right (but with insufficient evidence to

11

confirm this diagnosis). (Tr. 607-08). There was no definite evidence of polyneuropathy or other generalized process. (Tr. 608). An April 30, 2020, EMG of Mr. Howard's upper extremities revealed generally normal sensory nerve conduction bilaterally. (Tr. 651-52). However, the needle electrode exam revealed mild chronic neurogenic motor unit potential changes in the C8 muscles on the left. (Tr. 652). There was no evidence of a brachial plexopathy or of an entrapment mononeuropathy. (*Id.*).

Mr. Howard presented to Dr. Kuns for reevaluation of his migraines on May 28, 2020. (Tr. 637). Mr. Howard reported that sumatriptan helped to decrease the severity and length of his migraines. (*Id.*). Mr. Howard reported that the medication decreased the severity of his headaches before they developed into migraines. (Tr. 639). Quixotically, Mr. Howard stated that the frequency of his headaches had both increased in frequency and decreased compared to the previous month. (*Id.*).

## IV.    MEDICAL OPINIONS

**Wayne Morse, Ph.D.** The State Agency referred Mr. Howard for a psychological evaluation with Dr. Wayne Morse on October 9, 2019. (Tr. 494-99). Dr. Morse diagnosed Mr. Howard with major depressive disorder, panic disorder, obsessive-compulsive disorder, and PTSD. (Tr. 498). Dr. Morse noted that Mr. Howard had experienced head trauma with the loss of some cognitive and physical functioning. (*Id.*). Mr. Howard performed poorly on a memory task, and collateral information indicated poor memory function, but without examples of memory functioning interfering with his work. (*Id.*). Dr. Morse opined that the evidence suggested Mr. Howard would have mild difficulty understanding, remembering, and carrying out multi-step workplace instructions. (*Id.*).

Mr. Howard also performed poorly on a concentration task and had minor difficulty staying focused during the examination; however, there were no examples of concentration interfering with his ability to work. (Tr. 498-99). Dr. Morse opined that the evidence suggested Mr. Howard would have minor difficulty with concentration and persistence in work-related activity. (Tr. 499). Dr. Morse opined that Mr. Howard was able to respond appropriately to supervisors, coworkers, and the public in a work setting; he was also able to respond appropriately to normal pressures in a work setting. (*Id.*).

**State Agency Reviewers.** On November 11, 2019, Rohini Mendonca, M.D., reviewed Mr. Howard's file at the initial level. (Tr. 108-16). Dr. Mendonca opined that Mr. Howard was limited to medium exertion, with limitations to no ladders, ropes, or scaffolds and no unprotected heights, hazards, machinery, or driving as part of his job duties due to his history of migraines and seizures. (Tr. 108-110, 114). The only environmental limitation Dr. Mendonca found was that Mr. Howard should avoid all exposure to hazards such as machinery or heights; he was not otherwise limited for other environmental conditions. (Tr. 109-10).

Robyn Murry-Hoffman, Ph.D., opined that Mr. Howard had moderate limitations in understanding and remembering detailed instructions, but could understand, remember, and follow simple to moderately complex, routine tasks. (Tr. 111). He also had moderate limitations in his ability to perform at a consistent pace without an unreasonable number and length of rest periods; Dr. Murry-Hoffman opined that Mr. Howard's concentration, persistence, and pace were adequate for simple, routine tasks and that Mr. Howard can complete tasks not requiring a sustained fast pace or strict production demands. (Tr. 111-12). Mr. Howard had moderate limitations in his ability to respond appropriately to changes in the work setting; he would perform

13

best in a work setting with regular expectations and in which changes can be explained in advance.

(Tr. 112-13). Mr. Howard was determined not disabled. (Tr. 115).

These findings were affirmed on reconsideration by Jaime Lai on April 23, 2020, and by

James Cacchillo, M.D., on May 5, 2020. (Tr. 124-28).

## THE ALJ'S DECISION

The ALJ's decision, dated September 2, 2020, included the following findings of fact and

conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security
    Act through December 31, 2024.

2.  The claimant engaged in substantial gainful activity during the following
    periods: July 27, 2020, to present (20 CFR 404.1520(b) and 404.1571 *et seq*.).

3.  However, there has been a continuous 12-month period(s) during which the
    claimant did not engage in substantial gainful activity. The remaining
    findings address the period(s) the claimant did not engage in substantial
    gainful activity.

4.  The claimant has the following severe impairments: seizure disorder; panic
    disorder; obsessive-compulsive disorder (OCD); depression; alcohol abuse;
    posttraumatic stress disorder (PTSD) (20 CFR 404.1520(c)).

5.  The claimant does not have an impairment or combination of impairments
    that meets or medically equals the severity of one of the listed impairments
    in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525
    and 404.1526).

6.  After careful consideration of the entire record, I find that the claimant has
    the residual functional capacity to perform medium work as defined in 20
    CFR 404.1567(c), except: he can never climb ladders, ropes or scaffolds;
    frequently balance, stoop, kneel, crouch and crawl; must avoid all exposure
    to hazards such as unprotected heights, dangerous machinery and
    commercial driving; can understand, remember, and carry out simple
    instructions; perform simple, routine, and repetitive tasks but not at a
    production rate pace such as an assembly line; adapt to routine changes in
    the workplace that are infrequent and easily explained; interact frequently
    with supervisors and coworkers, and the general public.

7.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

8.      The claimant was born on July 26, 1961 and was 57 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 404.1563).

9.      The claimant has at least a high school education (20 CFR 404.1564).

10.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

12.     The claimant has not been under a disability, as defined in the Social Security Act, from April 8, 2018, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 44-57).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if

15

supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures

16

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

17

Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see*

*also Walters*, 127 F.3d at 529.

### DISCUSSION[6]

Mr. Howard presents three issues for this Court's review. For the reasons that follow, I find

none have merit and thus recommend the District Court affirm the Commissioner's decision.

**I.      Any Constitutional defects in Andrew Saul's appointment as Commissioner of the Social
Security Administration do not warrant remand in Mr. Howard's case.**

Initially, Mr. Howard argues that the appointment[7] of Andrew Saul as Commissioner of

the Social Security Administration violated the separation of powers and that the decision by an

ALJ who derived his authority from Andrew Saul was constitutionally defective. (Pl.'s Br., ECF #8,

PageID 686, 693). The Commissioner agrees with Mr. Howard that 42 U.S.C. § 902(a)(3)'s

removal provision "violates the separation of powers to the extent it is construed as limiting the

President's authority to remove the Commissioner without cause." (Comm'r's Br., ECF #9,

PageID 716). But even so, the Commissioner responds that Mr. Howard's separation of powers

argument does not entitle him to a rehearing of his claim. (*Id.*).

---

[6]      I provide the following discussion based on the arguments fully developed in the
parties' briefs. All perfunctory or otherwise underdeveloped arguments the parties may have raised
are deemed waived. *See McPherson v. Kelsey,* 125 F.3d 989, 995-96 (6th Cir. 1997) (noting that
"issues adverted to in a perfunctory manner, unaccompanied by some effort at developed
argumentation, are deemed waived").

[7]      Despite initially styling the argument as an attack on former Commissioner Saul's
appointment, Mr. Howard later clarifies in his reply brief that his argument "was not an
appointments clause challenge" and was instead centered on improper delegation of authority by
the Commissioner to the adjudicators in his case. (*See* Pl.'s Reply Br., ECF #10, PageID 741-42).

Initially, I conclude Mr. Howard has not forfeited his ability to present his constitutional challenge even though he did not raise it at the administrative level. (*See* Pl.'s Br., ECF #8, PageID 696). In *Carr v. Saul*, 141 S. Ct. 1352 (2021), the Supreme Court held a claimant does not need to exhaust a constitutional claim at the administrative level, but instead may present such a claim for the first time at the district court level. *Id.* at 1362. But even though he has crossed this hurdle, Mr. Howard is not entitled to an order of remand from this Court.

In *Seila Law LLC v. Consumer Financial Protection Bureau,* 140 S. Ct. 2183 (2020), the Supreme Court found that a statutory restriction on the President's ability to remove the head of an agency "only for inefficiency, neglect, or malfeasance" violates the separation of powers and is unconstitutional. *Id.* at 2197. The Court further found the offending clause was severable from the other portions of its Act, thereby maintaining CFPB intact as an agency. *Id.* at 2208, 2211.

Subsequently, in *Collins v. Yellen,* 141 S.Ct. 1761 (2021), the Court considered the Federal Housing Finance Agency (FHFA) and its enabling statute, which contained a provision stating that the head of FHFA was removable by the President "only 'for cause.'" *Id.* at 1770. The Court concluded such a provision violated the separation of powers and was unconstitutional. *Id.* Relying on *Seila Law,* the Court further explained the unconstitutionality of a removal provision does not strip an agency head of the authority to carry out the other functions of the office. *Collins,* 141 S.Ct. at 1788; *see also id.* at n.23 ("Settled precedent also confirms that the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office . . . .") (citing *Seila Law,* 140 S.Ct. at 2207-11). Instead, to obtain remand, the plaintiff must demonstrate "compensable harm" flowing from the unconstitutional removal clause. *See Collins,* 141 S.Ct. at 1788-89. The absence of a nexus between the purported harm and the

19

challenged removal restriction "defeats the . . . argument for setting aside" agency action. *Id.* at 1787.

Mr. Howard makes various claims alleging he has suffered harm due to the unconstitutional removal provisions in § 902(a)(3). (Pl.'s Br., ECF #8, PageID 694-95). He initially argues he did not receive a valid administrative process because the ALJ's authority to make disability determinations was derived from a Commissioner who was subject to an unconstitutional removal provision. (*Id.*). In addition, Mr. Howard claims the ALJ and the Appeals Council did not have valid authority to adjudicate his claim because former Commissioner Saul did not have authority to delegate his duties to them. (*Id.*; *see also* Pl.'s Reply Br., ECF #10, PageID 738).

Mr. Howard's allegations as to former Commissioner Saul's (and Acting Commissioner Berryhill's) inability to delegate authority to lesser officials in the Social Security Administration is unavailing. As in *Collins*, the existence of an unconstitutional removal provision did not strip then-Commissioner Saul of his authority to carry out the functions of his office, including the authority to delegate disability determinations to ALJs and to implement changes to Agency regulations. As noted by the Court in *Collins*, "[a]lthough the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by FHFA . . . as void." 141 S. Ct. at 1787 (emphasis in original). The *Collins* Court further found "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office" because the removal restriction was unconstitutional. *Id.* at 1788 ("unlawfulness of the removal provision does not strip the Director

of the power to undertake the other responsibilities of his office, including implementing the third amendment") (citing *Seila Law*, 140 S. Ct. at 2207-11). Rather, "to obtain reversal of an agency decision, a plaintiff would need to demonstrate compensable harm flowing from the unconstitutional removal clause." *Id.* at 1788-89.

Mr. Howard also claims he was harmed by new HALLEX regulations implemented by former Commissioner Saul, although he does not provide specifics as to how he was harmed. (Pl.'s Br., ECF #8, PageID 695; *see also* Pl's Reply Br., ECF #10, PageID 741-42). Finally, Mr. Howard asserts that "it appeared that President Biden believed that Mr. Saul had infringed on the constitutional due process rights of disability applicants" such as himself. (Pl.'s Br., ECF #8, PageID 695).

Although "the Constitution automatically displaces any conflicting statutory provision from the moment of the provision's enactment," it is still possible for an unconstitutional statutory provision to inflict compensable harm entitling claimants to retrospective relief. *Id.* The Supreme Court offered examples of situations where unconstitutional removal restrictions could inflict compensable harm:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id.* at 1789. Notably, each of these examples require that the President specifically acknowledge being prevented from removing an agency head due to the unconstitutional statutory provision. Expressions of displeasure from the President, without more, do not demonstrate the type of compensable harm flowing from the removal provision contemplated by the *Collins* Court.

Mr. Howard has not alleged that the President "asserted that he would remove the [Commissioner] if the statute did not stand in the way." *Id.* Rather, Mr. Howard makes generalized statements and allusions as to the President's displeasure, but does not point to public statements by the President stating that but for the statute, he would remove the Commissioner: "when President Biden finally terminated Mr. Saul as Commissioner, there were remarks regarding the effect the Commissioner had on the disability adjudication process," and "it appeared that President Biden believed that Mr. Saul had infringed on the constitutional due process rights of disability applicants." (Pl.'s Br., ECF #8, PageID 695; *see also* Pl.'s Reply Br., ECF #10, PageID 739).  Therefore, any argument Mr. Howard makes to show compensable harm flowing from President Biden's inability to remove former Commissioner Saul due to the unconstitutional removal provision fails.

Moreover, the specific ALJ who presided over his case—Judge Sher—was not appointed by a commissioner subject to § 902(a)(3)'s removal restriction, but rather was ratified by an Acting Commissioner who was not tenure-protected. (*See* Comm'r's Br., ECF #9, PageID 718). Because Acting Commissioner Berryhill served pursuant to provisions of the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345-3349c, her appointment was not subject to the same constitutional deficiencies as Commissioner Saul. *See* 5 U.S.C. § 3346(a)(1). Acting Commissioner Berryhill had no statutory tenure protections. *See* 42 U.S.C. § 902(b)(4); *see also Collins*, 141 S. Ct. at 1782-83 (noting that FHFA's Acting Director was removable at-will because the relevant subsection "does not include any removal restriction. Nor does it cross-reference the earlier restriction on the removal of a confirmed Director. . . . we generally presume that the President holds the power to remove at will executive officers and that a statute must contain 'plain language to take [that

power] away.'"); *United States v. Eaton*, 169 U.S. 331, 343 (1898) ("Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered.").

Because Acting Commissioner Berryhill was not the "superior and permanent official" as a confirmed director, she was removable at-will; thus, there is no nexus between Acting Commissioner Berryhill's ratification of Judge Sher's appointment and the unconstitutional provisions of § 902(a)(3). As a result, I conclude Mr. Howard has not shown that Acting Director Berryhill, the Appeals Council, or Judge Sher lacked authority to carry out the functions of their respective offices due to the constitutional defect in § 902(a)(3). *See Collins*, 141 S. Ct. at 1788 n.23 (noting that "unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office . . . ").

Mr. Howard also relies on *Tafoya v. Kijakazi*, No. 21-CV-871-REB, 2021 WL 3269640 (D. Colo. July 29, 2021), for the proposition that "ALJs were operating without constitutional authority and their determinations were null." (Pl.'s Reply Br., ECF #10, PageID 737). But Mr. Howard's reliance on an unreported district court case from outside this circuit is unpersuasive, particularly where that case has received unfavorable treatment from courts within this judicial district. *See Fauvie v. Comm'r of Soc. Sec.*, No. 4:20-CV-2750, 2022 WL 2662866, at *3 n.3 (N.D. Ohio July 11, 2022) ("*Tafoya*, an unreported decision from a district court outside this judicial district, only addressed a plaintiff's standing to bring a claim, which requires far less of a showing

than establishing harm from an unconstitutional provision. . . . In any event, the argument is moot inasmuch as the Court has assumed standing for purposes of its analysis."). Simply put: *Tafoya* does not represent the prevailing view – courts in this district and across the country have concluded the allegedly unconstitutional appointment of Andrew Saul does not require remand. *See, e.g., Katrina R. v. Comm'r of Soc. Sec.*, No. 2:21-CV-4276, 2022 WL 190055, at *5 (S.D. Ohio Jan. 21, 2022) (collecting cases); *Fauvie*, 2022 WL 2662866, at *3; *Miley v. Comm'r of Soc. Sec.*, No. 1:20-CV-2550, 2021 WL 6064754, at *9 (N.D. Ohio Dec. 22, 2021). I conclude Mr. Howard's reliance on *Tafoya* is unpersuasive and thus decline to recommend remand on this basis.

Because Mr. Howard has not articulated a specific, compensable harm he sustained as a result of the unconstitutional removal provision in § 902(a)(3), his constitutional challenge fails.[8]

## II. The ALJ did not err at Step Two of the sequential evaluation process.

Mr. Howard next argues that the ALJ failed to find that he had additional[9] severe physical impairments at Step Two of the sequential evaluation process. (Pl's Br., ECF #8, PageID 696). Mr.

---

[8]     Given this determination, it is unnecessary for me to address the Commissioner's alternative arguments opposing Mr. Howard's constitutional challenge (harmless error doctrine, de facto officer doctrine, rule of necessity, and broad prudential considerations). (Comm'r's Br., ECF #9, PageID 724-27). *See, e.g., Cary v. Mox*, No. 17-cv-12862, 2018 WL 4402939, at *10 n.6 (E.D. Mich. Aug. 14, 2018) ("Because Defendants Washington and Leach are entitled to summary judgment on the basis of exhaustion, and in the interest of judicial economy, the Court does not reach their alternative arguments for dismissal or summary judgment."), *report and recommendation adopted*, 2018 WL 4385793 (E.D. Mich. Sep. 14, 2018); *see also Butcher v. Comm'r of Soc. Sec*, No. 2:20-CV-6081, 2021 WL 6033683, at *8 (S.D. Ohio Dec. 21, 2021) ("Plaintiff's separation of powers claim lacks merit. Accordingly, the Undersigned does not reach the Commissioner's alternative arguments including harmless error, de facto officer, the rule of necessity, and other prudential considerations."), *report and recommendation adopted*, 2022 WL 523519 (S.D. Ohio Feb. 22, 2022).

[9]     Mr. Howard states: "In addition to the severe psychological impairments noted above, the ALJ found that [Mr.] Howard had additional medically determinable impairments of status-post cervical fusion with C8 radiculopathy on the left and cervical degenerative disc disease and arthritis; cognitive deficits related to a traumatic brain injury, a history of a heart attack,

Howard provides an overview of his record—including recounting some of his work history—to show that he meets the *de minimis* standard of proof to show at Step Two that his impairments caused more than minimal limitations on his ability to sustain full-time work. (*Id.* at PageID 696-700; *see also* Pl.'s Reply Br., ECF #10, PageID 735-36).

The Commissioner responds that Mr. Howard's citations to his medical record do not meet SSR 19-4p's standards for finding migraines to be a severe impairment at Step Two. (Comm'r's Br., ECF #9, PageID 727-28). Thus, the ALJ did not err because Mr. Howard did not show that his migraines, or other conditions, impeded his ability to work on a full-time basis. (*Id.* at PageID 728). Moreover, the Commissioner asserts it is harmless error for an ALJ to fail to find an impairment severe at Step Two, as long as the ALJ considers all impairments when forming the RFC. (*Id.*). Mr. Howard acknowledges that a Step Two error does not necessarily warrant reversal if the ALJ considers the impairments through the remainder of the sequential evaluation, but nevertheless asserts "the ALJ failed to find any impairments related to [Mr.] Howard's continuing physical problems and symptoms" and "the ALJ failed to note any symptoms related to his additional impairments." (Pl.'s Br., ECF #8, PageID 700).

---

insomnia, vertigo, obstructive sleep apnea, migraines, and a history of left knee arthroscopic surgery. Per the ALJ, there was no evidence that these conditions caused more than minimal limitations on [Mr.] Howard's ability to perform work-related activities. The record also provided eviden[ce] of additional impairments related to his seizures, a history of a lacunar infarct, dysphagia with resulting diagnosis of severe ulcerative esophagitis. (Pl.'s Br., ECF #8, PageID 696-97). Despite listing numerous other conditions, Mr. Howard does not develop them beyond passing reference. (*See id.* at PageID 696-700). He only develops argument as to the ALJ's consideration of his migraines at Step Two. (*See id.* at PageID 699). I therefore limit my review to whether the ALJ properly considered Mr. Howard's migraines and deem arguments as to any other conditions waived. *McPherson*, 125 F.3d at 995-96.

25

Ultimately, I agree with the Commissioner; Mr. Howard's assertion that the ALJ failed to find *any* impairments or note *any* symptoms is not consistent with the record. Therefore, any error that may have resulted from a failure to find Mr. Howard's migraines severe at Step Two is rendered harmless by the ALJ's consideration of all impairments when forming the RFC.

At Step Two of the sequential evaluation, the ALJ determines whether an individual's impairments are severe. 20 C.F.R. § 404.1520. Step Two severity regulations have been construed as a *de minimis* hurdle for the claimant to clear in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). Under these regulations, an impairment is determined "not severe" if it does not "significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522. To clear this *de minimis* hurdle, the claimant must demonstrate more than a "slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs*, 880 F.2d at 862; *see also* SSR 85-28. The severity regulation is intended only to "allow the Secretary to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working." SSR 85-28 (quoting *Baeder v. Heckler*, 768 F.2d 547, 553 (3d Cir. 1985)).

But an ALJ's failure to find a severe impairment where one exists may not constitute reversible error, if the ALJ determines the claimant has at least one other severe impairment and proceeds through the sequential evaluation process. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). However, this rule assumes that the ALJ considers both severe and non-severe limitations and their effects on the claimant to create an RFC that meaningfully considers the claimant's remaining capacity for work. *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 326 (6th Cir. 2015). Only where "there is no allegation of a physical or mental

26

limitation . . . . and no information in the case record that there is such a limitation or restriction" is an ALJ directed to find no RFC limitation or restrictions. SSR 96-8p.

There is no Listing for migraines or headache disorders. SSR 19-4p. Rather, SSR 19-4p directs ALJs to evaluate primary headache disorders under Listing 11.02 relating to epilepsy and dyscognitive seizures. *Id.* When evaluating a headache disorder under Listing 11.02B, SSR 19-4p instructs the ALJ to consider: a detailed description of a typical headache event from an acceptable medical source; the frequency of headache events; adherence to prescribed treatment; side effects of treatment; and limitations in functioning that may be associated with the headache disorder or its treatment. *Id.* To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in Listing 11.02D, the ALJ is to consider the same factors from Listing 11.02B, and to consider whether the overall effects result in marked limitation in: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. *Id.*

Here, the ALJ provided the following Step Two analysis of Mr. Howard's migraine disorder:

> The claimant has also been diagnosed with migraines. He was prescribed Excedrin tension headache medication in 2018, and he received emergency hospital treatment for a migraine in July of 2019. The claimant reported worsening migraines in March of 2020, but he was only having them a couple of times per month. He was initially prescribed over-the-counter medication, and then Sumatriptan in April of 2020. The following month, the claimant indicated the medication had helped with the severity of his headaches, but their frequency had increased.
>
> . . .
>
> In this instance, the record does not show that other causes of the claimant's headaches have been ruled out, nor does it contain observations of objective signs by an acceptable medical source or third party during an actual headache event. I have considered the claimant's testimony that his headaches have persisted despite treatment with Sumatriptan in finding migraines to be a medically determinable

27

impairment pursuant to SSR 19-4p, but the record as a whole does not show they are severe. He required little treatment for migraines until the spring of 2020, and even thereafter, their frequency and severity are not well documented. He testified that he has only missed work once due to a migraine since he returned to work, and that he drives 55 miles to and from work every day, which tends to indicate his symptoms are not significantly limiting. Regardless, to the extent that they are supported by the medical evidence, his migraines are accommodated by the assessed residual functional capacity with limitations on work complexity, pace and changes, and on working around hazards.

(Tr. 46). The ALJ explicitly analyzed Mr. Howard's migraines according to the requirements of SSR 19-4p. He notes that their frequency and severity were not well-documented. And, even taking Mr. Howard's testimony about his migraines as true, the ALJ also notes that Mr. Howard testified only to missing one day of work due to migraines. Therefore, the ALJ concluded they were not severe and did not present more than minimal limitations on Mr. Howard's ability to work.

But even if that decision at Step Two was in error, the ALJ considered the effects of Mr. Howard's migraines in the RFC analysis. When forming the RFC at Step Four, the ALJ provided the following:

[Mr. Howard] said his blood pressure was out of control, his migraines were so severe that he felt paralyzed, and he felt very low and had difficulty getting out of the house or his chair. . . . He said his blood pressure is now under better control, but he continues to have headaches about five days per week. He said he takes Sumatriptan, which helps with their severity, but not their frequency. He indicated that sometimes his headaches last an hour, and sometimes for five days. However, he indicated he has only missed work once due to a migraine since he began his recent job.

. . .

With regard to his activities, the claimant reported that he began working full-time in July of 2020 and he drives more than 55 miles each way to and from work. He said he is not sure he can continue, because he is slower and has difficulty keeping up, and he sometimes has temporary short-term memory issues, in addition to his headaches and anxiety.

. . .

I find that restrictions on commercial driving, working around hazards, and climbing ladders, ropes and scaffolds are still reasonable, given the claimant's medical history

and his testimony that he continues to have migraine headaches. Therefore, these limitations have been included in the above residual functional capacity.

And,

> He has required relatively little treatment for his migraines or his psychological symptoms, as also discussed above. This tends to indicate those conditions have also been generally under control with the medications he has been prescribed. For all the above reasons, I find the medical evidence of record to be more probative of the claimant's residual functional capacity than his testimony and allegations.

(Tr. 50, 52, 55).

Moreover, the ALJ also considered other of Mr. Howard's non-severe impairments when forming the RFC. (*See* Tr. 51). I do not discuss those other impairments here, *see* n. 9, *supra*, but the ALJ's discussion of additional non-severe impairments lends credence to the Commissioner's argument that the ALJ indeed considered *all* impairments, both severe and non-severe when forming Mr. Howard's RFC. Thus, the Step Two error, if any, was corrected by the ALJ considering all impairments in the RFC.

I therefore find no reversible error and decline to recommend remand.

### III. The ALJ considered Mr. Howard's impairments and symptomology and the RFC is supported by substantial evidence.[10]

Finally, Mr. Howard argues the ALJ "erred in that he failed to consider the effect of the combination of [Mr.] Howard's severe impairments and related symptomology on his ability to

---

[10]    Although styled as a contention against the RFC, Mr. Howard's third argument for remand is a hodgepodge of underdeveloped arguments, often made without reference to the RFC or criteria within the Step Four sequential evaluation process. As best I can discern, the arguments Mr. Howard fully raises are based in the ALJ's consideration and articulation of his severe and non-severe impairments, and whether the ALJ appropriately considered Mr. Howard's subjective symptoms. I deem all other arguments for remand waived, including whether Mr. Howard meets Listing criteria, articulation of medical opinion evidence, and others. *McPherson*, 125 F.3d at 995-96.

engage in substantial gainful activity on a full-time and sustained basis" when forming the RFC. (Pl.'s Br., ECF #8, PageID 701). For the reasons described below, I find no merit to any part of this argument.

### A. The ALJ appropriately considered Mr. Howard's non-severe impairments when forming the RFC.

Mr. Howard again attacks the ALJ's analysis of his migraine headaches, stating that he "failed to consider whether [Mr.] Howard's migraine headaches satisfied the criteria of [SSR] 19-4p." (Pl.'s Br., ECF #8, PageID 701). He states "the ALJ in this matter also failed to thoroughly analyze [Mr.] Howard's headaches." (*Id.* at PageID 702). He claims the ALJ did not consider the combination of Mr. Howard's impairments. (*Id.* at PageID 704).

As I presented more fully in Section II above, the ALJ does compare Mr. Howard's headache disorders in accordance with the criteria described in SSR 19-4p and provides a full analysis of his symptomology and any resulting limitations as the regulations require. As such, I find the ALJ's analysis of Mr. Howard's headache disorder or migraines provides no basis to require remand.

The ALJ also considered certain of Mr. Howard's other non-severe impairments and their effect on his functional ability when forming the RFC. For example, the ALJ considered Mr. Howard's past inguinal hernia and repair on his ability to lift weight. (Tr. 52). The ALJ also considered Mr. Howard's blood pressure, arthritis, uneasiness, poor vision, and nerve damage in his left arm. (Tr. 49-50). The ALJ also considered Mr. Howard's history of lacunar infarction. (Tr. 51). Because the ALJ has considered all of Mr. Howard's impairments (including those deemed non-severe), I conclude there is no reason to require remand.

B.    **The ALJ appropriately considered Mr. Howard's functional limitations caused by his severe impairments.**

Mr. Howard argues he meets the requirements for Listing 11.02 (seizure disorders) and/or the mental Listings. (Pl.'s Br., ECF #8, PageID 701-04; Pl.'s Reply Br., ECF #10, PageID 735). However, despite the reference to meeting various Listing criteria, Mr. Howard's argument actually centers on the ALJ's analysis of the evidence and whether his functional limitations were disabling. (Pl.'s Br., ECF #8, PageID 704-05) ("Howard is alleging disability due to the fact that his functional limitations were sufficient to establish disability. . . . the ALJ offered only a perfunctory analysis of what he considered to be the relevant Listings and related functional limitations."). He argues the ALJ erred because the ALJ did not consider his impairments in combination, and that remand is required for consideration of the totality of the evidence. (*Id.* at PageID 704).

Thus, I focus my discussion on the ALJ's articulation of the evidence considered and whether the RFC appropriately accommodated Mr. Howard's functional limitations. I follow the arc of Mr. Howard's apparent argument and decline to reframe it as a Step Three Listing discussion. With that, I turn to the consideration and articulation standards required of ALJs when forming a claimant's RFC.

The ALJ alone is responsible to form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1546. The RFC is to be an assessment of the claimant's remaining capacity for work once the claimant's limitations have been considered. *Webb*, 368 F.3d at 632. An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors

31

regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* (citing SSR 16-3p). An ALJ "is only required to incorporate those limitations which he has deemed credible" and may reject limitations or impose more restrictions. *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). Doing so does not mean an RFC is not supported by substantial evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18, 2015).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). An ALJ's factual findings are conclusive on review, if supported by substantial evidence and correctly applied legal standards. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019); *see also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence presupposes there is a "zone of choice" within which the Commissioner may act without interference from the courts. *White*, 572 F.3d at 281-82). When an ALJ's decision is supported by substantial evidence, this Court must affirm. *Id.*

When evaluating a claimant's impairment, the ALJ must provide sufficient explanation for the claimant and any reviewing court to "trace the path of his reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (internal quotations omitted). However, the ALJ is not required to provide an exhaustive account at each stage of the analysis; rather, an ALJ's opinion is read "as a whole and with common sense." *Avery*, 2020 WL 2496917, at *13 (citing *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678 (7th Cir. 2010)). An ALJ need not repeat the same analysis at each stage, but must articulate the reasoning enough to permit meaningful review. *Id.*

Although Mr. Howard argues he meets various Listing criteria, his argument is more aptly considered a request to re-weigh the evidence and come to his preferred conclusions. Such a request is outside the scope of this Court's review. *See Brainard,* 889 F.2d at 681. It bears repeating that even if substantial evidence supports a claimant's position, this Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477. This is so because of the "zone of choice" within which the Commissioner can act without fear of court interference. *Mullen,* 800 F.2d at 545.

As the Commissioner states, the ALJ thoroughly considered the totality of the evidence and connected the evidence contained in the record with specific RFC limitations. (Comm'r's Br., ECF #9, PageID 732). More specifically, when making his determination that Mr. Howard was not disabled, the ALJ presented the following analysis:

- As noted above, at various times the claimant has been placed on restrictions such as no driving and no operation of heavy machinery, due to his seizure disorder. . . . I find that restrictions on commercial driving, working around hazards, and climbing ladders, ropes and scaffolds are still reasonable, given the claimant's medical history and his testimony that he continues to have migraine headaches. (*Compare* Tr. 52 *with* Tr. 331, 482).

- The ALJ found that additional non-exertional limitations were necessary beyond those opined by Dr. Morse, based on objective findings and observations of poor performance on memory and concentration tests, as well as Mr. Howard's reported difficulties with short-term memory, depression, anxiety, frequent panic attacks, and flashbacks. (*Compare* Tr. 53 *with* Tr. 496-97).

- The ALJ noted that although Plaintiff took antidepressants, he was observed to have a normal mood, affect, speech, psychomotor movement, attitude, thought process and content (*Compare* Tr. 52 *with* 363).

- The ALJ considered that Mr. Howard worked part-time during the adjudication period and had returned to full-time work despite experiencing no significant change in his condition. (Tr. 54-55). In addition, Mr. Howard's

33

daily activities, including driving 55 miles to and from work, belied the alleged severity of his symptoms. (*Id.*).

• The ALJ indicated Mr. Howard's seizure medication appeared effective at controlling this disorder, as he had not experienced a seizure episode in the past year, and prior episodes occurred when Mr. Howard had been vomiting his medication or not taking it as prescribed. (*Compare* Tr. 55 *with* Tr. 339, 343-44, 398-400, 408, 466, 582).

• The ALJ further noted that Mr. Howard's migraines and psychological symptoms appeared to be well-controlled with medication. (*Id.*). The ALJ referenced that Mr. Howard denied receiving specialized mental health treatment and received his Xanax prescription from his primary care physician. (Tr. 53).

This review of the ALJ's articulated reasons against the record confirms that the ALJ appropriately considered Mr. Howard's severe impairments when forming the RFC. Mr. Howard bears the burden of providing disability, whether at Step Three when arguing he meets a Listing, or at Step Four, when arguing against the ALJ's RFC determination. *Walters,* 127 F.3d at 529. Mr. Howard has not met this burden, nor has he shown that the ALJ did not properly consider the evidence in his case. Mr. Howard's arguments to the contrary are unavailing and amount to a re-weighing of the evidence in his favor. Substantial evidence supports the ALJ's findings with respect to his formation of the RFC and articulation of the evidence considered. I decline to recommend remand on this basis.

**C.    The ALJ appropriately considered Mr. Howard's subjective statements.**

Finally, Mr. Howard argues the ALJ did not appropriately consider his subjective statements of pain. (Pl.'s Br., ECF #8, PageID 705-06). But, as the Commissioner reminds this Court, an ALJ is not required to accept a claimant's subjective symptoms or incorporate them into the RFC, nor do a claimant's subjective symptoms establish disability. (Comm'r's Br., ECF #9, PageID 728).

SSR 16-3p describes the two-step process for evaluating an individual's symptoms. First, the Commissioner determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Then, the Commissioner evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources (such as family and friends). *Id.*

An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery*, 2020 WL 2496917, at *11. The ALJ must also determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ deems it inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p.

The ALJ need not use any "magic words," as long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617-JDG, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). The ALJ's evaluation of subjective evidence receives broad deference from the reviewing court. *Baumhower v. Comm'r of Soc. Sec.*, No.

3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). This Court may not disturb

the ALJ's analysis of the claimant's subjective complaints, and the conclusions drawn from it,

absent compelling reason. *Id.* (internal quotations and citations omitted).

Following my review, I find no compelling reason to disturb the ALJ's analysis. The ALJ

articulates Mr. Howard's subjective statements throughout his decision, for example:

- He said his blood pressure is now under better control, but he continues to have headaches about five days per week. He said he takes Sumatriptan, which helps with their severity, but not their frequency. He indicated that sometimes his headaches last an hour, and sometimes for five days. However, he indicated he has only missed work once due to a migraine since he began his recent job. (Tr. 50).

- The claimant testified that he sleeps on the second floor, but he has difficulty going up and down the flight of 14 steps due to a combination of arthritis pain, headaches, uneasiness and poor vision. With regard to his hobbies, the claimant said that nerve damage in his left arm makes it difficult for him to play music, and he has not ridden his motorcycle in three years. He indicated he returned to driving during the fall of 2019, as he had been seizure-free for six months at that time. (*Id.*).

- The claimant reported worsening memory issues to his primary care provider in March of 2020, but his mental status was grossly intact upon examination. (Tr. 52).

- However, I find that restrictions on commercial driving, working around hazards, and climbing ladders, ropes and scaffolds are still reasonable, given the claimant's medical history and his testimony that he continues to have migraine headaches. Therefore, these limitations have been included in the above residual functional capacity. (*Id.*).

- In this instance, however, the above factors [including the individual's daily activities] are not probative of disability. The claimant engages in a wide range of daily activities . . . His description of his current work duties, including the ability to drive 55 miles to and from work daily, indicates that he is performing this work at a level that would not be expected, given the severity of symptoms and limitations he has alleged. (Tr. 55).

36

These excerpts exemplify the ALJ's consideration and articulation of the evidence throughout the decision. In my review, the ALJ properly evaluated Mr. Howard's subjective symptoms and sufficiently articulated his reasoning to permit meaningful review of his decision. The ALJ considers all of Mr. Howard's impairments—both severe and non-severe—when forming the RFC, and incorporates appropriate limitations into the RFC. The ALJ considered Mr. Howard's subjective symptoms regarding his limitations with respect to his memory, mental health, physical health, pain, migraines, and seizures, among other impairments. The ALJ also compared these statements against Mr. Howard's statements of his activities, such as his ability to control the severity of his migraines with medication, his ability to move his house, and his ability to drive because his seizures were generally controlled with medication. I conclude there is no basis to disturb the ALJ's analysis regarding Mr. Howard's subjective statements.

I find no error with respect to Mr. Howard's third argument and decline to recommend remand.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying disability insurance benefits supported by substantial evidence and recommend the decision be **AFFIRMED**.

Dated: August 24, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).